UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RONALD RODRIGUEZ,

                            Petitioner,

    – against –

Superintendent PHILLIP HEATH,

                            Respondent.

**MEMORANDUM & ORDER**

12-CV-824 (ERK)

---

KORMAN, *J.*:

On October 3, 2006, allegedly in self-defense, petitioner Ronald Rodriguez shot and killed Bilah McGraw during a struggle in a dark alleyway. Petitioner was charged with second-degree murder, first-degree manslaughter, second-degree manslaughter, and third-degree criminal possession of a weapon. The jury acquitted him of the first two offenses—the only ones on which the jury was instructed on the defense of justification. Rodriguez was convicted of second-degree manslaughter and third-degree criminal possession of a weapon.

Consistent with his position on direct appeal, petitioner principally argues that the trial judge erred by refusing to charge justification as to the manslaughter offense of which he was ultimately convicted, and that this error—which eliminated the prosecution's burden to "prove [the] absence [of justification] to the same degree as any element of the crime charged," *People v. McManus*, 67 N.Y.2d 541, 547 (1986)—violated his right to have the jury determine whether the prosecution had established every element of the offense beyond a reasonable doubt, *see* Brief for Defendant-Appellant at 21–22, *People v. Rodriguez*, 911 N.Y.S.2d 79 (App. Div. 2010) (No. 2008-11075) [hereinafter Pet'r's App. Br.]. I proceed to discuss the details that led to McGraw's death and the legal questions arising from the trial judge's failure to instruct the jury on justification, as

well as other, secondary issues raised in this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

On the night in question, petitioner was with a group of friends outside of 103 Terrace Avenue in Hempstead, New York. Trial Tr. 1047–48; Pet'r's Video Statement 2:09, 3:34, Sept. 5, 2007 [hereinafter Video]. Terrace Avenue, nicknamed "Terror Avenue," is known as a "rough area" with gang activity. Trial. Tr. 976, 1072. Petitioner is five feet, two inches tall—the source of his nickname, "Shorty"—and, at that time, weighed approximately 125 pounds. *Id.* at 1444.

At some point in the evening, petitioner tossed two empty glass bottles into the street, causing them to shatter. *Id.* at 1048. Seeing this, McGraw, who weighed 249 pounds and was five feet, seven inches tall, *id.* at 1643, approached the group with whom petitioner was standing "in a violent manner," *id.* at 1049. He yelled at petitioner for "five or ten minutes," claiming that petitioner was "making the block hot"—i.e., attracting unwanted police attention—and accusing petitioner of not being from the neighborhood. *Id.* at 1049–51. McGraw also said that he was a member of a gang known as "T.A.P." (or "Terrace Avenue Posse"). Video 4:59. In his written confession, which was offered by the prosecution, petitioner told police that "[w]hen Bilow [the victim] came over, I could tell he was dusted. Being dusted means you are high on PCP." Trial Tr. 1354. The medical examiner confirmed at trial that McGraw had phencyclidine (PCP) in his bloodstream that night, *id.* at 1643, and that PCP is a dissociative narcotic which is known to cause agitation, confusion, desensitization, paranoia, and aggression, *see id.* at 1734–37. After McGraw yelled at petitioner for throwing the bottles, petitioner "was pretty much submissive, like he didn't want to argue with [McGraw]. He was basically like trying to say, like, okay, you're right, you're right. I apologize, I didn't mean to." *Id.* at 1051. McGraw eventually left. *Id.*

A few hours later, petitioner and his friends observed McGraw walking back in their direction with a man named Travis, peering into buildings as he passed, as though looking for someone. *Id.* at 1055–56, 1059. McGraw had one hand in his pants pocket and one hand in his coat. *Id.* at 1055. Petitioner did not see if the two men were carrying weapons, but believed from their body language that they were. Video 11:00. Petitioner explained to police that he was scared of McGraw. *Id.* at 6:40; Trial Tr. 1449. Another witness, called by the prosecution, testified that she also believed the two men were concealing weapons, and was frightened of them. Trial Tr. 1084–87. Upon seeing McGraw and Travis, petitioner ran in the opposite direction, turning left down an alleyway that allowed access to Bedell Street, which runs perpendicular to Terrace Avenue. Video 6:40; Trial Tr. 1056. The lighting in the alley was broken, and it was dark. Trial Tr. 976–77.

Petitioner stated that when he turned the corner of the alley, he found that his egress was blocked by another one of McGraw's friends, "Booboo," who was holding a twelve-gauge shotgun. Video 6:49. No witnesses had a view down the alley, and Booboo's involvement was neither confirmed nor contradicted at trial. The lead detective on the case stated at a pretrial hearing that an individual who goes by the nickname "Booboo" lives at 100 Terrace Avenue. Hr'g Tr. 133. She "may have" run a background check on him, *id.*, but never talked to him, Trial Tr. 1452. She also neither asked Travis about Booboo, Trial Tr. 1452, nor asked him whether he and McGraw had "intended to rob or otherwise beat up" petitioner, *id.* at 1408.

The trial testimony was also unclear as to whether petitioner's exit from the alley was entirely blocked, or if there may have been a small gap in a back fence through which he could have exited. *See, e.g.*, Trial Tr. 967–971, 979–81, 1395–96. Nevertheless, believing himself unable to pass safely, Video 6:49, 9:27, petitioner turned back toward the Terrace Avenue entrance

to the alley and, on the way, picked up a shotgun that, according to his video and written confessions, he knew either one of his friends or he and a group of his friends had stored in the alley (along with a stash of drugs), Video 7:39; Trial Tr. 1355–56. Petitioner then confronted McGraw and Travis where the alley met the street. Trial Tr. 1156–57. He allegedly told Travis, "holla at your man," by which he meant that Travis should speak to McGraw on petitioner's behalf. *See* Video 8:50, 10:14. Petitioner explained to police that he was trying to defuse the situation by telling Travis, with whom petitioner had a distant familial relationship, to calm McGraw down. *Id.* at 8:52, 10:10. He was also trying to communicate to Travis: "[W]e supposed to be family. Like, why are you trying to get me?" *Id.* at 9:20. A witness said she saw McGraw turn towards the alley and raise his hands in a "fist motion." Trial Tr. 1060. Petitioner allegedly was holding the gun "on the side" of his body at this point, Video 8:55, although another witness believed that she saw a shotgun barrel sticking out from the alley, Trial Tr. 1060. McGraw turned into the alley and grabbed for the gun, Trial Tr. 1061, 1089, while Travis fled, *id.* at 1157; Video 10:32.[1]

No witnesses saw the subsequent struggle in the alleyway. According to petitioner, McGraw shoved him against a wall and wrestled for control of the gun while also trying to strike him in the head with the butt of the weapon. Video 10:32, 11:46. At some point during the fight, the shotgun "went off," hitting McGraw in the chest and killing him. *Id.* at 11:37.[2] The medical examiner testified that, because of the absence of stippling and the presence of satellite perforations and scalloping, the shot that killed McGraw was likely not fired from very close range, and that the trajectory of the shot was downward and to the right, entering from the left side of McGraw's

---

[1] The lead detective confirmed at trial that after running away from petitioner and McGraw, Travis ran first to Bedell Street—where petitioner had claimed to have seen Booboo standing at the back entrance of the alleyway—and then into 100 Terrace Avenue, Trial Tr. 1384–85, which is the address the detective had found for an individual who goes by the alias "Booboo," Hr'g Tr. 133.

[2] In his first oral statement, which he recanted, petitioner suggested that he had not picked up a shotgun in the alley and that McGraw was carrying the shotgun that, during the ensuing scuffle, accidentally fired the shot that killed him. Trial Tr. 1318–19.

chest. Trial Tr. 1649–51, 1673. McGraw's body was found ten feet into the alley. *Id.* at 959, 993, 1283. Because the medical examiner testified that McGraw would not have been able to walk more than three feet after being shot, *id.* at 1724, the location of his body provided some support for petitioner's claim that McGraw had forced him backward into the alley during the fight. Video 10:36. Petitioner claimed to remember McGraw continuing to attack him for several minutes after being shot, *id.* at 12:19, although the medical examiner testified that the gunshot wound would have killed McGraw almost instantly, Trial Tr. 1679.

At the conclusion of a two-and-a-half week jury trial, defense counsel asked the judge to add the defense of justification to all four charges against his client. Trial Tr. 1778–85. The judge gave the justification instruction as to second-degree murder and first-degree manslaughter, but denied the charge, without explanation, as to second-degree manslaughter and third-degree criminal possession of a weapon. *Id.* at 1792–93. The jury acquitted petitioner of the first two offenses but convicted him of second-degree manslaughter and third-degree criminal possession of a weapon. *Id.* at 1986–87. The trial judge sentenced him to the maximum term of imprisonment allowable under law: seven-and-a-half to 15 years for manslaughter, and a concurrent sentence of three-and-a-half to seven years for criminal possession. St'g Tr. 15.

On appeal, the Appellate Division rejected petitioner's argument that the refusal to charge justification as to manslaughter in the second degree "so infected the proceedings as to deprive appellant of due process and a fair trial." Pet'r's App. Br. 21. In explaining its reasoning, the panel stated only that "no reasonable view of the evidence in this case supported [a justification] charge with regard to manslaughter in the second degree." Moreover, it held that the justification defense did not apply to third-degree criminal possession of a weapon. *People v. Rodriguez*, 911 N.Y.S.2d 79, 79 (App. Div. 2010), *perm. app. denied*, 16 N.Y.3d 836 (2011).

## DISCUSSION

The various degrees of homicide as defined in the New York Penal Law do not include lack of justification as an element of the offense. Instead, New York law recognizes a "defense of justification (Penal Law art[.] 35) [that] affirmatively permits the use of force under certain circumstances." *McManus*, 67 N.Y.2d at 545. A defendant's use of deadly physical force is justified as long as the following conditions are met: (1) the defendant subjectively believed that deadly physical force was necessary to defend himself, and that belief was objectively reasonable under the circumstances; (2) the defendant retreated from the encounter if he knew that he was able to do so with complete safety; and (3) the defendant was not the initial aggressor. *See* N.Y. Penal Law § 35.15; *see also Jackson v. Edwards*, 404 F.3d 612, 623 (2d Cir. 2005). The term "deadly physical force" is statutorily defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(11).

Rather than including lack of justification as an element of the homicide offense and thus forcing a trial judge to instruct the jury on justification in every homicide case—the vast majority of which do not involve that defense—New York has adopted a very liberal standard that allows a defendant for whom the defense is applicable to have the jury instructed on it without requiring a heavy burden of proof. *See People v. Steele*, 26 N.Y.2d 526, 528 (1970). Thus, "if on any reasonable view of the evidence, the fact finder might have decided that defendant's actions were justified . . . the trial court should instruct the jury as to the defense and must when so requested." *People v. Padgett*, 60 N.Y.2d 142, 144–45 (1983). In making this determination, the court must consider the evidence in the light most favorable to the defendant. *Padgett*, 60 N.Y.2d at 144; *see also Davis v. Strack*, 270 F.3d 111, 124–25 (2d Cir. 2001). Moreover, the instruction must be

given even where the defendant's testimony is inconsistent with a justification defense. Thus, even "when a defendant claims to have killed someone accidentally in the course of defending himself, the New York courts repeatedly have found reversible error in the failure to give a requested justification charge." *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (citing cases); *see also Padgett*, 60 N.Y.2d at 146 (justification should have been charged even when an aspect of defendant's testimony was inconsistent with justification defense); *Steele*, 26 N.Y.2d at 529 (justification charge warranted even where defendant put forth an alibi defense and the only evidence consistent with justification was drawn from the prosecution's evidence); Resp't's Opp'n Pet. Habeas Corpus 49–50, ECF No. 8.

Justification is classified in New York as "an ordinary defense rather than an affirmative one." *McManus*, 67 N.Y.2d at 546. "As such, whenever justification is sufficiently interposed by the defendant, the People must prove its absence *to the same degree as any element of the crime charged*." *Id.* at 546–47 (emphasis added); *see also* N.Y. Penal Law § 25.00(1). Thus, it has long been held that "the People have the burden of disproving beyond a reasonable doubt a defendant's claim that he was acting in the exercise of that right." *McManus*, 67 N.Y.2d at 546. The availability of the defense does not depend on the *mens rea* of the particular homicide offense. Indeed, the Court of Appeals has specifically held that it may be asserted as a defense to manslaughter in the second degree, which is an offense predicated on recklessness. *Id.* at 548. Thus, "in a prosecution for . . . [any] crime involving the use of force, a charge on justification is warranted whenever there is evidence to support it." *Id.* at 549. Phrased differently, "[s]ince the People have the burden of disproving [justification] beyond a reasonable doubt, all that is required is evidence of the defense, which if credited, is sufficient to raise a reasonable doubt." *People v. Butts*, 72 N.Y.2d 746, 749 n.1 (1988).

Consistent with these statutory requirements, the trial judge here instructed the jury that, as to the murder and first-degree manslaughter charges, petitioner could be found guilty only if the prosecution met its burden of proving beyond a reasonable doubt "that the defendant was not justified." Trial Tr. 1938–42. In refusing to give a similar charge as to second-degree manslaughter, the only homicide offense of which petitioner was convicted, the judge eliminated the prosecution's burden to prove beyond a reasonable doubt what amounts to an element of that offense.

Under these circumstances, two issues present themselves. The first is whether the Constitution requires that an element of an offense be submitted to the jury. The answer to this question is fairly straightforward. The failure to charge the jury on an essential element of the offense, as defined by New York law, deprives a defendant of his Sixth and Fourteenth Amendment rights to have the jury determine whether the prosecution has met its burden of proving his guilt beyond a reasonable doubt. Nevertheless, as explained above, the law is complicated by the fact that, on its face, the sections of the Penal Law dealing with homicide and its varying degrees do not define the lack of justification as an element of the offense that must be proven beyond a reasonable doubt. Instead, lack of justification takes on the attributes of an element of the offense only if petitioner comes forward with sufficient evidence, when viewed in the light most favorable to him, to establish the elements of the defense of justification. *Reynoso*, 73 N.Y.2d at 818.

I discuss below the elements of the defense of justification as applied to the facts of this case and then move to the second issue of, whether, if the jury should have been instructed on the defense of justification with respect to the charge of second-degree manslaughter, the Appellate Division's holding that such a charge was not warranted by the evidence constituted "an

unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## 1. New York Law

To establish justification in New York, a defendant must establish that he had a subjective fear that "the use of force was necessary under the circumstances." *Matter of Y.K.*, 87 N.Y.2d 430, 434 (1996). Nevertheless, such a subjective fear is not enough. Instead, the evidence must be sufficient to show "that his reactions were those of a reasonable man acting in self-defense." *Reynoso*, 73 N.Y.2d at 818. In determining whether the defendant's belief was reasonable "under the circumstances," *see People v. Goetz*, 68 N.Y.2d 96, 114–15 (1986), the physical attributes of both the defendant and the assailant are relevant, *see, e.g.*, *In re Delroy S.*, 25 N.Y.3d 1064, 1067 (2015) (evidence supporting justification defense included that "[t]he complainant was older, taller, heavier and stronger than [defendant]"), as are the "physical movements of the potential assailant" in the moments preceding the homicide, *see Goetz*, 68 N.Y.2d at 114; *see also, e.g.*, *Jackson*, 404 F.3d at 624 (justification charge warranted where defendant shot unarmed but heavily intoxicated man who had allegedly pushed and punched him); *Strack*, 270 F.3d at 119–20, 130 (justification charge warranted where defendant shot man who had attacked him on previous occasions after the man moved his hand toward his waist and started to turn toward defendant). Courts will also consider "any relevant knowledge" that the defendant had about the assailant, such as whether he was under the influence of drugs. *See, e.g.*, *Strack*, 270 F.3d at 117, 120, 129 (relying in part on the fact that the assailant was "visibly high" on PCP in concluding that the defendant's fear was reasonable); *People v. Frazier*, 776 N.Y.S.2d 294, 294 (App. Div. 2004) (whether "the victim had ingested PCP before the altercation . . . was relevant on the issue of whether it was objectively reasonable for [the] defendant to perceive him as dangerous.").

The *mens rea* for manslaughter in the second degree, of which petitioner was convicted, incorporates a reasonableness standard: it requires the jury to find that the defendant's "disregard" of "a substantial and unjustifiable risk that another person's death will occur" constituted "a gross deviation from the standard of conduct that a reasonable person would observe in the situation." Trial Tr. 1943; N.Y. Penal Law § 15.05(3). Nevertheless, in weighing that charge here, the jurors may not have understood whether they could consider the reasonableness of petitioner's actions through a self-defense lens. Specifically, they may have thought they were not permitted to consider petitioner's statement that the gun went off during the course of an altercation with McGraw, the victim, in which petitioner believed himself to be acting in self-defense. Indeed, the trial judge emphasized no less than five times that petitioner's "self-defense" argument applied only to counts one and two: murder in the second degree and manslaughter in the first degree. *See* Trial Tr. 1932, 1936, 1937, 1939, 1942; *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (adequacy of jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (citation omitted)).

The jurors could have understandably interpreted those instructions to mean that they could not take defendant's alleged fear of McGraw into account in determining whether he deviated from a reasonable standard of conduct in handling the shotgun, or in retrieving it from its cache within the alley in the first instance. Indeed, the jury submitted a note to the judge requesting to hear "the *three* points of criteria" to be considered under second-degree murder and first-degree manslaughter and "the *two* points of criteria to be considered under manslaughter in the second degree," Trial Tr. 1967 (emphases added), which further suggests that the jury understood there to be a critical distinction between the homicide offenses for which the absence of justification was an element, and the homicide offense for which it was not.

The District Attorney argues that, in "acknowledging that he did not see McGraw (or Travis) with a gun, [petitioner] effectively conceded" that his statement to police that McGraw "acted" like he was carrying a gun "was pure conclusory, unsupported opinion." Resp't's Opp'n Pet. Habeas Corpus 44. And, when "there is 'nothing but speculation to support either the objective or subjective aspects of the justification charge,' a court may deny the request for such a charge." *Id.* at 46–47 (citations omitted). The District Attorney is correct that "a creation of mere fear or fancy or remote hearsay information or a delusion pure and simple and not rationally supported . . . would not satisfy the requirements of a justification for the conduct." *People v. Lumsden*, 201 N.Y. 264, 269 (1911).

This argument, however, ignores the fact that the gravamen of the justification defense is what the defendant *believed*, regardless of its ultimate truth. N.Y. Penal Law § 35.15(1). Whether the decedent was in fact capable of using deadly force is irrelevant as long as it was reasonable for the petitioner to perceive such a risk. *See, e.g.*, *Strack*, 270 F.3d at 120, 130 (justification charge improperly denied even though the decedent, whom the petitioner allegedly believed had a gun, was ultimately found only to be in possession of a small carpet knife). The fact that no gun was recovered from McGraw's body is not, therefore, dispositive. Moreover, the District Attorney ignores the evidence supporting petitioner's justification defense.

Petitioner is five feet, two inches tall and weighed approximately 125 pounds at the time of the incident, while McGraw was five feet, seven inches tall and weighed 249 pounds. Trial Tr. 1444, 1449, 1643. Petitioner explained to the police that he could tell McGraw was high on PCP on the night of the incident, *id.* at 1354, and the medical examiner confirmed this at trial, *id.* at 1643. Both petitioner and another witness stated that they were frightened when McGraw, who earlier in the evening had claimed to be a member of a local gang, *see* Video 4:59, returned to the

scene of his confrontation with petitioner and began "looking in the buildings, peaking in the alleys" while keeping his hands concealed, *see* Trial Tr. 1055–56, 1059, 1084–87; Video 6:40. Petitioner told police that he believed, based on McGraw's body language, that McGraw was carrying a gun, Video 11:00, and the prosecution's only witness to the approach of McGraw and Travis said that she believed the same, Trial Tr. 1084. Petitioner also told police that he ran away from McGraw into the alley because he was scared, Video 6:40; *see also* Trial Tr. 1449, and that, in telling Travis to "holla at your man," he was effectively asking, "why are you trying to get me?," Video 9:20.

This evidence distinguishes this case from *People v. Watts*, 57 N.Y.2d 299 (1982), which the District Attorney cites for the proposition that "defendant's statement to police that victim came after defendant in his room with a kitchen knife 'was insufficient to require a jury charge on the defense of justification' because it provided no basis for determining whether defendant reasonably believed he was in imminent danger of being subjected to deadly physical force." Resp't's Opp'n Pet. Habeas Corpus 46. The description of the holding in *Watts* ignores the significant qualifying language in that case that "this evidence [defendant's statement], *standing alone*, was insufficient to require a jury charge on the defense of justification." *Watts*, 57 N.Y.2d at 302 (emphasis added). A footnote to the text in *Watts* suggests that the Court of Appeals was troubled by the absence of corroborating evidence for the defendant's statement that the victim came into his room with a kitchen knife. *See id.* at 302 note. There is some tension between this language and the holding of the Court of Appeals in *People v. Goetz*, 68 N.Y.2d 96 (1986), that "[b]ecause the evidence before the second Grand Jury included [uncorroborated] statements by Goetz that he acted to protect himself from being maimed or to avert a robbery, the prosecutor correctly chose to charge the justification defense in section 35.15 to the Grand Jury." *Id.* at 106;

*see also id.* at 101 ("Goetz stated that he knew from the smile on Canty's face that they wanted to 'play with me.' Although he was certain that none of the youths had a gun, he had a fear, based on prior experiences, of being 'maimed.').[3] By contrast, in the present case, there is more evidence, referenced above, than merely the defendant's statement—"standing alone"—that the defendant may have reasonably believed that he was in imminent danger of being subjected to deadly force.

Thus, viewing the evidence in the light most favorable to petitioner, s*ee Padgett*, 60 N.Y.2d at 144, a jury could have found that petitioner subjectively believed, *and* that it was objectively reasonable for him to believe that McGraw had returned to shoot him, and that deadly force was necessary for his own protection. Indeed, even if the verdict acquitting petitioner of murder in the second degree and manslaughter in the first degree turned on petitioner's statement that the shotgun simply "went off" during the struggle—or was "accident[al]," Trial Tr. 1823 (defense summation)—the jury must have credited a substantial portion of petitioner's version of the events. *See Jackson*, 404 F.3d at 625 ("That the jury convicted Jackson of second degree manslaughter rather than second degree murder on the basis of his counsel's alternative argument that the shooting was accidental suggests that the jury was, in fact, open to crediting Jackson's version of events."); *Strack*, 270 F.3d at 131 ("[T]he jury, by ruling in Davis's favor on the question of extreme emotional disturbance, showed that it generally accepted the truthfulness of Davis's testimony."); *cf. Turpin v. United States*, 281 F.2d 637, 639 (D.C. Cir. 1960) ("That the jury gave some credence to appellant's theory is suggested to a degree by the return of the lesser included

---

[3] Later in the *Goetz* opinion, the Court of Appeals described the jury's role as follows: "The jury must first determine whether the defendant . . . believed deadly force was necessary to avert the imminent use of deadly force . . . . If the People do not prove beyond a reasonable doubt that he did not have such beliefs, then the jury must also consider whether these beliefs were reasonable. The jury would have to determine, in light of all the 'circumstances,' as explicated above, if a reasonable person could have had these beliefs."

offense of manslaughter in circumstances where he might well have been convicted of [second] degree murder.").

Nevertheless, a finding of reasonableness is not enough. The trier of fact still must determine whether the defendant knew that he could have retreated with complete safety, but failed to do so. N.Y. Penal Law § 35.15(2)(a). "The duty to retreat reflects the idea that a killing is justified only as a last resort, an act impermissible as long as other reasonable avenues are open." *People v. Jones*, 3 N.Y.3d 491, 494 (2004). If a defendant knows that he can safely retreat but chooses to stand his ground, the defense of justification is lost. *See Jackson*, 404 F.3d at 623. When petitioner saw McGraw walking back to the site of their earlier argument with his hands concealed, he ran away from him into the alley. Video 6:40. He alleges—and no witnesses contradicted—that he returned to face McGraw only after discovering that the back exit of the alley was blocked by "Booboo," McGraw's shotgun-wielding friend. *Id.* at 6:49. The District Attorney nonetheless argues that petitioner could have successfully retreated from either end of the alley. *See* Resp't's Opp'n Pet. Habeas Corpus 47–48. While acknowledging that petitioner told police that he knew that Booboo was "with" McGraw and Travis, the District Attorney relies on petitioner's statement that he had not previously "ha[d] any problems with Booboo" in arguing that petitioner could have exited the alley past Booboo (and his shotgun). *See id.* at 47. Alternatively, she contends that, "with a fully visible shotgun, [petitioner] was in a perfect position to 'retreat' from unarmed McGraw and Travis with complete safety." *Id.* at 48.

The duty to retreat turns, however, not on whether petitioner *in fact* could have retreated safely, but whether he "*knew* he could retreat with complete safety." *People v. La Susa*, 447 N.Y.S.2d 738, 738 (App. Div. 1982) (finding that the lower court "committed substantial error" by instructing the jury to determine whether defendant "*could* have" retreated, rather than whether

he "*knew* he could retreat with complete safety"); N.Y. Penal Law § 35.15(2)(a). Construing the evidence in the light most favorable to petitioner, a jury could have found that petitioner reasonably believed that he was trapped in an alley between three armed men, leaving him no "reasonable avenue[]" for escape, *see Jones*, 3 N.Y.3d at 494. Similarly, the possibility that there may have been a small bend in the fence through which petitioner might have fit is insufficient to establish that he *knew* he could have retreated with "complete safety": petitioner may not have seen the gap in the fence while running in the dark, or may have believed that, even if he had squeezed through, he would have still been left vulnerable to Booboo. *See La Susa*, 447 N.Y.S.2d at 738. Nor is there any indication that petitioner could have retreated safely once he and McGraw began struggling over the shotgun. *See Y.K.*, 87 N.Y.2d at 434 ("[W]hen the kicking and punching started . . . . [defendant] was unable to retreat safely under those circumstances . . . .").

Finally, assuming there is otherwise a sufficient basis to submit the issue of justification to the jury, a defendant is not entitled to the charge if he was the "initial aggressor" in the conflict that led to the homicide, unless he subsequently withdrew from the encounter and effectively communicated that withdrawal. N.Y. Penal Law § 35.15(1)(b). "Generally speaking, the person who takes the offensive, [when] he is not himself being or is about to be attacked and strikes or attempts to strike the first blow is the initial aggressor." *See Mojica v. Fischer*, No. 00 Civ. 8933 (RJH), 2005 WL 2230450, at *8 (S.D.N.Y. Sept. 12, 2005) (quoting and finding no error in trial judge's instructions on the issue of initial aggressor); *see also People v. Walker*, 726 N.Y.S.2d 857, 857 (App. Div. 2001); *People v. McGee*, 571 N.Y.S.2d 66, 67 (App. Div. 1991). The question of who struck the first blow is not necessarily determinative, however, because "[o]ne who reasonably believes that another person is about to use deadly physical force upon him need not wait until he is struck or shot. He may in such circumstances use deadly physical

force defensively." *Mojica*, 2005 WL 2230450, at *8. Thus, even assuming that the ultimate confrontation began when petitioner met McGraw at the entrance to the alley with the shotgun in hand, a reasonable jury construing the evidence in the light most favorable to petitioner could have found that he was acting "defensively" in the reasonable belief, based on the evening's events, that McGraw was about to use deadly force against him, and thus was not the initial aggressor. *See id.*

In sum, there is a "reasonable view of the evidence" on which "the fact finder might have decided that the defendant's actions were justified." *Strack*, 270 F.3d at 124. Indeed, based on the exact same set of facts, the trial judge determined that a justification charge was appropriate as to the other two homicide counts of which petitioner was acquitted. Under these circumstances, the trial judge's refusal to give the instruction, for which he gave no reason, was erroneous under New York law, and deprived petitioner of his right to have the jury determine whether the prosecution had proved beyond a reasonable doubt that the homicide was not justified.

## 2. The Constitutional Standard

The Second Circuit has twice granted habeas relief on the ground that a state trial judge erred in refusing to give a justification charge warranted by the evidence in a manslaughter prosecution. *Jackson v. Edwards*, 404 F.3d 612, 628 (2d Cir. 2005); *Davis v. Strack*, 270 F.3d 111, 135 (2d Cir. 2001); *see also Harris v. Alexander*, 548 F.3d 200, 203 (2d. Cir. 2008) (affirming grant of writ of habeas corpus where trial judge refused to instruct jury on "agency" defense); *Dingle v. Mance*, 716 F. Supp. 2d 309, 322–23 (S.D.N.Y. 2010) (granting habeas relief based on erroneous omission of justification charge). In granting these petitions, the Second Circuit acknowledged that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to

deciding whether a conviction violated the Constitution, laws, or treaties of the United States."

*Strack*, 270 F.3d at 123 (quoting *Estelle*, 502 U.S. at 67–68).

Nevertheless, the *Strack* panel explained that

> [t]he fact that 'federal habeas corpus relief does not lie for errors of
> state law,' *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), does not
> mean, however, that errors under state law cannot result in
> cognizable violations of a constitutional right to due
> process. What due process requires will often depend on what state
> law is. States are free to define the elements of, and defenses to,
> crimes. *See Apprendi v. New Jersey,* 530 U.S. 466, 484–87 (2000);
> *McMillan v. Pennsylvania,* 477 U.S. 79, 84–86 (1986). Once states
> have promulgated laws to define criminal conduct, however, federal
> due process protects a defendant from conviction unless he is shown
> in a fair proceeding to have violated those laws.

*Strack*, 270 F.3d at 123; *cf. United States v. Dodd*, 225 F.3d 340, 344 (3d Cir. 2000), *as amended*

(Oct. 27, 2000) ("[T]he Due Process Clause requires the government to prove all elements of the

charged offense beyond a reasonable doubt, and therefore requires the government to disprove

beyond a reasonable doubt any defenses that negate an element of the charged offense . . . ."

(citation omitted)).

More significantly for present purposes, this analysis is consistent with long-standing

Supreme Court precedent that "[t]he Due Process Clause requires the prosecution to prove beyond

a reasonable doubt all of the elements *included in the definition of the offense* of which the

defendant is charged." *McMillan*, 477 U.S. at 85 (quoting *Patterson v. New York*, 432 U.S. 197,

210 (1977) (emphasis in original)); *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (holding

that the Sixth and Fourteenth Amendments "require criminal convictions to rest upon a jury

determination that the defendant is guilty of every element of the crime with which he is charged,

beyond a reasonable doubt"); *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause

protects the accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged."); *see also Gilmore v. Taylor*, 508 U.S. 333, 341 (1993) (describing "the *Winship* line" of cases, which "establish that States must prove guilt beyond a reasonable doubt with respect to every element of the offense charged"). If the jury is not instructed on an element of the offense, then a defendant has necessarily been deprived of his right to have a jury determine whether the prosecution has met its burden of proving his guilt beyond a reasonable doubt.

Thus, in *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court held that the omission of an instruction on an element of an offense violates the Sixth Amendment's jury trial guarantee by preventing a jury from rendering a "complete verdict" on every element of an offense. *Id.* at 12, 15; *see also Gaudin*, 515 U.S. at 510. While such a failure does not constitute a structural error, which can never be harmless, the Supreme Court held that the failure to give an instruction as to an element of an offense is not harmless "where the defendant contested the omitted element and raised evidence sufficient to support a . . . finding" that the element had not been proven beyond a reasonable doubt. *Neder*, 527 U.S. at 19. Significantly, the harmless error standard appears to dovetail with the circumstances under which New York law requires the jury to be charged on the issue of justification. *See Butts*, 72 N.Y.2d at 749 n.1 ("Since the People have the burden of disproving [justification] beyond a reasonable doubt, all that is required is evidence of the defense, which if credited, is sufficient to raise a reasonable doubt.").

Indeed, under similar circumstances, the Second Circuit has found that the omission of a justification charge to which the defendant was entitled was "sufficiently *harmful* to make the conviction unfair." *Strack*, 270 F.3d at 123–24, 132 (emphasis added). Relying on the Supreme Court's holding in *Cupp v. Naughten*, 414 U.S. 141 (1973), that "the question is . . . whether the ailing [jury] instruction by itself so infected the entire trial that the resulting conviction violates

due process," *id.* at 147, the Second Circuit concluded in both *Strack* and *Jackson* that the trial judge's refusal to give a justification charge to which the defendant was entitled was constitutional error. *See Strack*, 270 F.3d at 123, 131 (quoting *Cupp*, 414 U.S. at 147); *Jackson,* 404 F.3d at 624 (same); *see also Estelle*, 502 U.S. at 72 (quoting and reaffirming *Cupp* standard); *Harris*, 548 F.3d at 203–06 (applying *Cupp* standard in finding that the refusal to instruct jury on "agency" defense warranted habeas relief). The Second Circuit explained that the key question under *Cupp* is whether "the erroneous failure to give [a justification] charge was sufficiently harmful to make the conviction unfair," and in both cases answered that question in the affirmative. *Strack*, 270 F.3d at 123–24; *accord Jackson*, 404 F.3d at 624–25; *see also, e.g.*, *U.S. ex rel. Means v. Solem*, 646 F.2d 322, 332 (8th Cir. 1980) (refusal to instruct jury on petitioner's theory of self-defense was an error of "constitutional magnitude" that violated due process).

The more general *Cupp* standard, however, is not as helpful a guide as the Supreme Court cases specifically holding that a defendant is entitled to have the jury instructed on each element of the offense. Moreover, because of the generality of the *Cupp* standard, it may be more difficult for a petitioner to establish that the state court holding was unreasonable. *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Nevertheless, applying the *Cupp* standard here would likely lead to the same conclusion as the application of the more specific Supreme Court cases. As in *Strack*, the omission of the justification charge effectively "guaranteed" petitioner's conviction of manslaughter in the second degree. *See Strack*, 270 F.3d at 131. Petitioner confessed to the fatal shooting. He did not introduce any witnesses. *See* Trial Tr. 1992. Defense counsel's closing argument relied principally on justification. *See, e.g.*, *id.* at 1819 ("[The prosecution] told you [in his opening statement] this case wasn't about bullying, it wasn't about self-defense . . . . I think he has to eat his words."), 1823 ("This was about self-defense."), 1857. Even though petitioner's

post-arrest statement may have suggested the possibility of an accidental discharge, a theory on which defense counsel also relied on summation, *see id.* at 1823, this possibility provides little defense against the manslaughter charge of which he was convicted, which is predicated on recklessness. "Without an instruction on the justification defense, the question whether [petitioner] was guilty of the homicide was thus open and shut. On the other hand, if the trial court had not ruled justification out . . . petitioner had a compelling defense for the jury to consider—on which the People had bore the burden of proof." *Strack*, 240 F.3d at 131. Most significantly, as noted earlier, petitioner was acquitted of both homicide offenses for which justification *was* charged. At a minimum, "[t]hat the jury convicted [petitioner] of second degree manslaughter rather than second degree murder . . . suggests that the jury was, in fact, open to crediting [his] version of events." *Jackson*, 404 F.3d at 625.

Nevertheless, because the failure to charge justification relieved the prosecution of proving an element of second-degree manslaughter beyond a reasonable doubt, and deprived petitioner of the right to have the jury determine whether the prosecution had met its burden of proof on an essential element of the offense, I need not rely on the more general Due Process standard articulated in *Cupp* in order to find a constitutional error here.

### 3. Application of AEDPA Standard

In his appellate brief, petitioner argued that the failure to charge justification as to the second-degree manslaughter charge "so infected the proceedings as to deprive [him] of due process and a fair trial," and cited to the Sixth and Fourteenth Amendments. *See* Pet'r's App. Br. 21–22. In rejecting that argument, the Appellate Division held, without elaboration, that there was no "reasonable view of the evidence [on which] the fact finder might have decided that the defendant's actions were justified." *People v. Rodriguez*, 911 N.Y.S.2d 79, 81 (App. Div. 2010).

Under 28 U.S.C. § 2254(d)(1), habeas relief is precluded unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." To constitute an "unreasonable application" of federal law, the state court decision "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The Appellate Division was asked to determine whether petitioner was convicted in violation of his rights under the Sixth Amendment and Due Process Clause to have a jury determine whether the prosecution had established every element of the offense, as defined by New York law, beyond a reasonable doubt. *See Neder*, 527 U.S. at 12; *McMillan*, 477 U.S. at 85. Moreover, because the charge on justification was given as to the two homicide charges of which petitioner was acquitted, the Appellate Division did not consider this question as a hypothetical, but rather against the backdrop of the actual jury verdict in this case.

My "role here is not to interpret New York's law of justification, but to determine whether the evidence was sufficient to warrant a justification charge under that law." *Strack*, 270 F.3d at 123 n.4. Under New York law, petitioner was entitled to have the prosecution prove beyond a reasonable doubt the absence of justification as to the second-degree manslaughter charge as long as *any* reasonable view of the evidence, *construed in petitioner's favor*, would have warranted that instruction. Where, as here, there is sufficient evidence in the record to support an instruction on justification, such a charge was compelled by New York law. The Appellate Division's holding

to the contrary deprived the defendant of his right to have the jury determine his guilt beyond a reasonable doubt, a right clearly defined by the holdings of the Supreme Court.

## ADDITIONAL GROUNDS RAISED IN THE PETITION

### 1. Justification as to Third-Degree Criminal Possession

Petitioner was charged with and convicted of third-degree criminal possession of a weapon. Under N.Y. Penal Law § 265.02(1), a person commits third-degree criminal possession when such person is guilty of criminal possession in the fourth degree and has also previously been convicted of any crime. There was a stipulation that petitioner had previously been convicted of a crime. *See* Trial Tr. 1792. Nevertheless, because the second element of third-degree criminal possession also incorporates by reference the offense of fourth-degree possession, it is necessary to identify the elements of the latter offense to the extent that they are relevant here. Based on the trial transcript, *see* Trial Tr. 921, and the jury instructions, *see* Trial Tr. 1944, the relevant subdivision of fourth-degree criminal possession that petitioner was alleged to have violated makes it an offense to "possess[] . . . [a] dangerous or deadly instrument or weapon with intent to use the same unlawfully against another . . . ." N.Y. Penal Law § 265.01(2). Thus, while not every subdivision of fourth-degree criminal possession requires proof of an intent to use the weapon unlawfully, the subdivision at issue here does require as much.

Against this backdrop, I turn to the issue of whether petitioner was entitled to an instruction on the defense of justification with respect to the charge of possessing a weapon. In New York, justification is only a defense to crimes involving the use of physical force. N.Y. Penal Law § 35.10. The Court of Appeals has long held that the defense is not available for crimes based only on possession of a weapon. *See, e.g.*, *People v. Pons*, 68 N.Y.2d 264, 265 (1986). Petitioner argues that if a properly charged jury found that he had possessed the weapon solely for the purpose

of self-defense, it would have acquitted him of possessing the weapon with the intent to commit an unlawful act.  Pet'r's App. Br. 22–23.  This argument had been rejected in *Davis v. Strack*, 270 F.3d at 134–35, in which the Second Circuit held that because justification under § 35.15 is not a defense to criminal possession of a weapon in the second degree, the denial of the instruction did not, with respect to the possession charge, violate "clearly established Federal law, as determined by the Supreme Court."  *Id.*; *see also* 28 U.S.C. § 2254(d)(1).

Nonetheless, the argument does find support in *Jackson v. Edwards*, 404 F.3d 612 (2d Cir. 2005), in which the judge failed to charge the jury on the defense of justification and in which the petitioner was convicted of criminal possession of a weapon in violation of N.Y. Penal Law § 265.03.  The Second Circuit held that "if a properly instructed jury were to have concluded that Jackson was not guilty of any homicide offense, then it might have also concluded that he lacked the requisite intent to be guilty of the weapons charge."  *Jackson*, 404 F.3d at 627.  This distinguished the case from *Strack* where there was some evidence from which a jury could have concluded that petitioner had obtained a gun with the intent to use it against the victim in retribution for previous criminal acts by the victim against petitioner.  "By contrast [in *Jackson v. Edwards*] . . . [t]here was, after all, no other evidence that he intended to use the weapon unlawfully 'during the continuum of time that he possessed it prior to the shooting.'"  404 F.3d at 627.  Under these circumstances "the trial court's failure to instruct the jury on the defense of justification with respect to the homicide count infected both of Jackson's convictions."  *Id.*  Indeed, it "so infected the entire trial that the resulting [weapons possession] conviction violate[d] due process," *id.* (quoting *Cupp*, 414 U.S. at 147).

The instant case is distinguishable from *Jackson*. The failure to instruct the jury on the defense of justification with respect to the second-degree manslaughter count did not "fatally

taint," *id.* at 626, petitioner's weapons possession conviction. Even if the jury had been charged on the defense of justification, it could have accepted that defense without also crediting petitioner's self-serving statement that the shotgun he allegedly used in self-defense had been stored in the alley along with a stash of drugs by his friend and that he grabbed it out of fear that McGraw was coming after him. The evidence at trial established that petitioner was a drug dealer and that the weapon that was used in the shooting was used both by him and a friend for protection when dealing drugs. Trial Tr. 1404. Indeed, in his written confession, petitioner said that when he ran back to the alley, he "picked up a small shotgun which is kept by *some of us* in the alley." *Id.* at 1355 (emphasis added). Significantly, in his written statement, petitioner also acknowledged that he had cocaine in his possession at the time of the shooting. *Id.* And the woman to whose home the defendant fled after the shooting testified that petitioner himself had been seen with the shotgun a few weeks before the shooting. *Id.* at 1068. A jury properly instructed on the second-degree manslaughter count could have found that the petitioner was justified in his use of the weapon, but that he also possessed the weapon prior to the shooting with the intent to use it in furtherance of the unlawful narcotics trafficking in which he was engaged. Thus, the factual basis that underlay the *Jackson* Court's holding that pre-shooting possession may have been at all times lawful does not exist in this case.

Ultimately, as a matter of New York law, petitioner was not entitled to a justification defense on the possession charge. Because of this and because it is not at all clear that the lack of justification charge with respect to the second-degree manslaughter count could have affected the jury's consideration of the possession count, the Appellate Division's affirmation of the trial court's refusal to charge justification on the possession count was not an unreasonable application of clearly established federal law as enunciated by the Supreme Court.

## 2. Admissibility of Petitioner's Post-Arrest Statements

Upon detaining petitioner (many months after the incident), Detective Jeannie Fitzpatrick read him his *Miranda* rights from a pre-printed card. Trial Tr. 1304–06. Petitioner voluntarily signed his name on the card, indicating that he understood his rights and was willing to answer questions. *Id.* Detective Fitzpatrick testified that petitioner then had second thoughts, telling police that he had "decided that he didn't want to give [them] a story," and wanted to "keep his story to himself" because he was afraid they would try to discredit it. *Id.* at 1312; Hr'g Tr. 62–63, 193–94. Fitzpatrick spent an hour urging petitioner to change his mind and make a statement before petitioner finally capitulated. Trial Tr. 1312, 1314. When he finished speaking, petitioner memorialized the statement in writing and signed each page. *Id.* at 1345–50.

When petitioner had completed the written statement, at some point between 4:30 P.M. and 5:45 P.M., *compare* Hr'g Tr. 86, *with* Trial Tr. 1358–60, Fitzpatrick asked him if he would be willing to make a videotaped statement, explaining that it would be "no different" than what petitioner had already done except that it would be conducted by the District Attorney, Trial Tr. 1359–60. Petitioner consented. Trial Tr. 1360. At approximately 5:45 P.M., Fitzpatrick and Hendry brought him to the District Attorney's office, *id.* at 1360–61, where Assistant District Attorney Christopher Holbrook reviewed petitioner's *Miranda* rights, Video 1:03; Trial Tr. 1524. Petitioner acknowledged that he had already waived his rights and once again agreed to give a statement. Video 1:38. The video interview began at 6:20 P.M., with Fitzpatrick and Hendry present in the room throughout. *Id.* at 0:01, 0:30; Hr'g Tr. 92; Trial Tr. 1515.

At the conclusion of the video interview, Holbrook showed petitioner the pre-printed *Miranda* card that he had signed at the station house several hours earlier, before making his oral and written confessions. Video 18:27. When Holbrook asked petitioner to confirm that he had

signed it, petitioner responded: "Yes, 'cause I wanted to help get this over with." *Id.* Petitioner also confirmed that no one had forced him to make a statement. *Id.* at 19:46.

At a pre-trial hearing, the judge found that petitioner's oral, written, and videotaped statements were admissible at trial. *See* Hr'g Tr. 251–52. The prosecution offered petitioner's written and videotaped statements into evidence at trial, and the jury asked for both during its deliberations. Trial Tr. 1969. On appeal, the Appellate Division held that the written statement should not have been admitted into evidence. *Rodriguez*, 911 N.Y.S.2d at 80–81. It found that petitioner "unambiguously and unequivocally invoked his right to remain silent" when he stated that he wanted to keep his story to himself, *id.* at 81 (citing *Berghuis v. Thompkins*, 560 U.S. 370 (2010); *People v. Stanley*, 738 N.Y.S.2d 869 (App. Div. 2002)), and that the police "continued to interrogate" petitioner rather than "scrupulously honoring" this right, *id.* (citing *People v. Pearson*, 799 N.Y.S.2d 155 (App. Div. 2005)). Nevertheless, the Appellate Division held that the videotaped confession was properly admitted into evidence, because "it was taken after a definite, pronounced break in questioning." *Id.* (citing *People v. Celleri*, 814 N.Y.S.2d 270 (App. Div. 2006)). Moreover, it held that the erroneous admission of the written statement was harmless beyond a reasonable doubt because "the evidence of the defendant's guilt, without reference to the tainted statements, was overwhelming." *Id.*

Petitioner does not challenge here the Appellate Division's harmless error finding as to the written statement, but argues that the break between his videotaped statement and his written statement was insufficient to eliminate the coercive effect of Detective Fitzpatrick's continued questioning after he attempted to invoke his right to silence, and thus that the admission of the videotape denied him due process and the right to a fair trial. *See* Pet. Habeas Corpus 13, ECF No. 1.

The Appellate Division made four factual findings relevant to this inquiry: (1) petitioner's videotaped statement was taken in a different location than his oral and written statements; (2) the videotaped interrogation was conducted by a different interviewer; (3) *Miranda* warnings were administered to petitioner before he made his oral or written statements, and then re-administered before the videotaped interrogation; and (4) the videotaped statement was taken after a "definite, pronounced break in questioning." *Rodriguez*, 911 N.Y.S.2d at 81. These findings are presumed correct in the absence of clear and convincing evidence otherwise, 28 U.S.C. § 2254(e)(1), and, in any event, are undisputed. While I question the legal sufficiency of the break in questioning preceding the videotaped statement, it is undisputed that somewhere between 35 minutes and two hours passed between when petitioner signed his written statement and when his videotaped interview began. *Compare* Hr'g Tr. 86, *with* Trial Tr. 1358–60. I therefore adopt the Appellate Division's factual findings.

The Appellate Division's determination that "the definite, pronounced break in questioning" between petitioner's interrogation at the stationhouse and his videotaped interrogation at the District Attorney's office was "sufficient to return [him] to the status of one who was not under the influence of the illegal questioning," *Rodriguez*, 911 N.Y.S.2d at 81 (citing *People v. Celleri*, 814 N.Y.S.2d 270 (App. Div. 2006)), is, however, a legal conclusion, *Bobby v. Dixon*, 132 S. Ct. 26, 29 n.1 (2011). The question here is whether that conclusion was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent. 28 U.S.C. § 2254(d)(1). I turn to that case law now.

The Supreme Court has long held that it is permissible for law enforcement officers to question a suspect who has previously invoked his right to silence, following a sufficient break, and that any subsequent confession may be admissible at trial. *Michigan v. Mosley*, 423 U.S. 96,

102–03 (1975) (*Miranda* cannot "sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent."). In *Mosley*, the Supreme Court considered a fact pattern with facial similarities to the instant case, upholding the admissibility of a statement taken after a break in questioning where, as here, the defendant was given a "fresh" set of *Miranda* warnings before making his second statement, and the second interrogation was taken in a different location, by a different officer, after a relatively short break. 423 U.S. at 104–106.

Petitioner's interrogations, however, differed from those in *Mosley* in several important respects. First, while the second interrogation in *Mosley* was restricted to "a crime that had not been a subject of the earlier interrogation," *id.*, petitioner's videotaped statement covered precisely the same story that Detective Fitzpatrick had drawn out of him just 35 minutes to two hours earlier. Indeed, Fitzpatrick specifically told petitioner that the videotaped interview would be "no different" than what petitioner had already done, except that it would be conducted by the Assistant District Attorney. Trial Tr. 1360. Second, while Mosley's interrogations were conducted by different detectives, *see* 423 U.S. at 104, petitioner was transported to the District's Attorney's office by the same two detectives who were involved in the initial, unconstitutional interrogation, and they remained present in the room throughout the questioning, Video 0:30; Hr'g Tr. 92; Trial Tr. 1360–61, 1515. Petitioner's two interrogations thus effectively "blended into one 'continuum.'" *See Dixon*, 132 S. Ct. at 31–32; *cf. Miranda v. Arizona*, 384 U.S. 436, 495–96 (1966) (finding in *Westover v. United States*, a case consolidated with *Miranda*, that although the defendant's second interrogation was conducted by different law enforcement officials, concerned a different crime, and was preceded by a set of warnings, "the impact on [the defendant] was that

of a continuous period of questioning," and therefore "an intelligent waiver of constitutional rights cannot be assumed").

Third, and most significantly, while Fitzpatrick pressured petitioner into answering her questions even after he told her that he wanted to "keep his story to himself," the detective in *Mosley* "immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position" after he had invoked his right to silence. 423 U.S. at 104. This fact was central to the holding in *Mosley* that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* The Court concluded that Mosley's statement was properly admitted only after finding that his second interrogation was sufficiently distinct from his first that his "'right to cut off questioning' was fully respected." *Id.* at 104–06. Petitioner's right to cut off questioning was not similarly honored. Because of these critical distinctions, *Mosley* is not dispositive of petitioner's claim.

An arguably more applicable standard is found instead in *Oregon v. Elstad*, in which the Supreme Court considered the admissibility of a statement taken after a conceded *Miranda* violation. 470 U.S. 298 (1985). Elstad's first inculpatory oral statement, which he made before being warned of his *Miranda* rights, was excluded by the trial judge, but his subsequent written confession, which he made after waiving his *Miranda* rights, was admitted into evidence. *Id.* at 302. He challenged its admission, arguing that the written confession should have been suppressed as the "'tainted fruit of the poisonous tree' of the *Miranda* violation." *Id.* at 303.

The Supreme Court affirmed the admission of the written statement. *Id.* at 318. Its holding rested largely on its determination that "a simple failure to administer the [*Miranda*] warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine the*

*suspect's ability to exercise his free will*" will not automatically "taint[] the investigatory process" such that "a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309 (emphasis added). While "*Miranda* requires that [an] unwarned admission must be suppressed," the Court reasoned, "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary," *id.* at 309, 318. Rather, "the admissibility of any subsequent statement" made after the administration of *Miranda* warnings "should turn . . . solely on whether it is knowingly and voluntarily made." *Id.* at 309. It also rejected the defendant's contention that his first, unwarned statement "let the cat out of the bag"—i.e., left him with the impression that "[t]he secret is out for good"—thus undermining the belated *Miranda* warnings by creating psychological pressure to provide a second confession. *Id.* at 311–12. The Court explained that "the psychological impact of voluntary disclosure of a guilty secret" does not "qualif[y] as state compulsion or compromise[] the voluntariness of a subsequent informed waiver." *Id.* at 312.

In concluding that Elstad's first statement had not been coerced, the Court observed only that the incident—in which a single police officer questioned the 18-year-old suspect in the living room of his home with his mother in the next room—"had none of the earmarks of coercion." *Id.* at 316 (citing *Rawlings v. Kentucky*, 448 U.S. 98, 110 (1980) ("[T]he conduct of the police here does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of petitioner's statements.")). It noted in particular that the officer also did not "exploit the unwarned admission to pressure [defendant] into waiving his right to remain silent." *Id.* Had the defendant in *Elstad* in fact been coerced, the Court explained, "the time that passe[d] between confessions, the change in place of interrogations, and the change in identity of the interrogators [would] all bear on whether that coercion ha[d] carried over into the second confession." *Id.* at 310.

Moreover, regardless of whether a first statement was actually coerced, in determining whether a subsequent *Miranda* waiver is voluntary, the Court instructed that "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect." *See id.* at 318. "Voluntary," in this context, means that the waiver "was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Accordingly, the essential question under *Elstad* is whether Detective Fitzpatrick's failure to respect petitioner's request to "keep his story to himself," constituted "actual coercion," and, if so, whether viewed in the context of the "entire course of police conduct" toward petitioner, that coercion rendered his subsequent *Miranda* waiver involuntary and the videotaped statement inadmissible. In answering that question, the recent application of the *Elstad* standard in *Bobby v. Dixon*, 132 S. Ct. 26 (2011), is instructive. There, the Supreme Court concluded that, although the police officers had intentionally violated *Miranda* by failing to give the requisite warnings, that breach "'involved no actual compulsion' and thus there was no reason to suppress [the defendant's] later, warned confession." *Id.* at 30. It found that "the circumstances surrounding [the defendant's] interrogations," including that "he received several breaks, was given water and offered food, and was not abused or threatened," "demonstrate that his statements were voluntary." *Id.* The Supreme Court also noted that "[t]hings had changed" between the defendant's unwarned statement and his waiver of his *Miranda* rights: he was transported from the police station to a separate jail and back; spoke with his lawyer; and learned that the police were talking to his accomplice and had found the murder victim's body. *Id.* at 32. This sufficed to create "a new and distinct experience" and thereby ensure that the *Miranda* warnings he received before his ultimate confession had the intended effect. *Id.* at 32.

Petitioner's case presents a closer question. As in *Dixon*, petitioner received several bathroom and cigarette breaks and was offered water and food. *See* Hr'g Tr. 52, 62, 75–76, 86–88. He was not "abused or threatened" into confessing; to the contrary, Fitzpatrick induced petitioner to tell his story primarily by explaining that she would not be able to "discredit" it, as he feared, as long as he told her the truth. *Id.* at 63. Petitioner told the Assistant District Attorney that he had signed the *Miranda* card earlier in the afternoon "'cause I wanted to help get this over with." Video 18:26. These circumstances are far less offensive than those typically rising to the level of a Fifth Amendment or Due Process violation. *See Elstad*, 470 U.S. at 312 n.3 (summarizing the severe fact patterns of cases in which a confession was found to be involuntary). Indeed, while Fitzpatrick's failure to respect petitioner's right to silence rendered his *first* confession inadmissible, it is unclear that her actions rose to the level of the "actual coercion" contemplated in *Elstad* such that it could potentially taint a later statement. While the *Elstad* Court did not define "coercion," it hinted at its understanding of the term when it referenced the consequences "flowing from coercion of a confession *by physical violence or other deliberate means calculated to break the suspect's will*." *Id.* at 312 (emphasis added). There was nothing close to physical violence in this case, and many of the factors that the Supreme Court has deemed relevant in determining whether a suspect's "will was overborne"—e.g., a lengthy detention, prolonged, repetitive questioning, and the deprivation of food or sleep, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)—were not present here.

On the other hand, if Fitzpatrick's continued questioning despite petitioner's attempts to end the interrogation rose to the level of "circumstances calculated to undermine the suspect's ability to exercise his free will"—a conclusion which I find difficult to accept—there is a fair argument that the coercive effect would have "carried over into the second confession" here.

*Elstad*, 470 U.S. at 309–10. Little had changed between petitioner's interrogation at the stationhouse and his interrogation at the District Attorney's office. *See Dixon*, 32 S. Ct. at 32. "[T]he time that passe[d] between confessions" was less than two hours (and possibly as little as 35 minutes), and the effect of the "change in place of interrogations, and the change in identity of the interrogators" was compromised by Fitzpatrick's statement to petitioner that the videotaped interrogation would be "no different" than what he had already done, as well as her constant presence throughout both interrogations. *See Elstad*, 470 U.S. at 310. Nevertheless, because I consider this question on a habeas petition following a state court's adjudication of the merits, I need not ultimately resolve whether the admission of petitioner's videotaped statement violated the principles set out in *Elstad*. Suffice it to say that the state court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods*, 135 S. Ct. at 1376 (quoting *Harrington*, 562 U.S. at 103).

Moreover, even if that standard were met, petitioner would not be entitled to habeas relief because any error in the admission of the videotape was harmless. An error is harmless unless it "resulted in 'actual prejudice.'" *Samuels v. Mann*, 13 F.3d 522, 526 (2d Cir. 1993) (quoting *Brecht v. Abramson*, 507 U.S. 619, 637 (1993)), *cert denied*, 513 U.S. 849 (1994). It is not necessary that the improperly admitted evidence had "no effect at all," but only that "the effect was not 'substantial and injurious.'" *Id.* at 528 (citation omitted); *accord Brecht*, 507 U.S. at 637. The most important factor in this analysis is the "overall strength of the prosecution's case." *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996) (citing *Latine v. Mann*, 25 F.3d 1162, 1167–68 (2d Cir. 1994)), *cert denied*, 520 U.S. 1108 (1997). The prosecution's remaining evidence need not be "overwhelming," only "weighty." *Id.* (citing *Samuels*, 13 F.3d at 527–28).

Petitioner cannot show such substantial and injurious effect here. It is true that "a full confession" may have an "indelible impact . . . on the trier of fact." *Arizona v. Fulminante*, 499 U.S. 279, 313 (1991) (Kennedy, J., concurring in the judgment). In this case, however, the impact of the confessions accrued to petitioner's benefit. Petitioner did not present any witnesses. *See* Trial Tr. 1992. While petitioner conceded in his statements that he was responsible for McGraw's death, the confessions also provided the sole basis for establishing either that petitioner was justified in shooting McGraw, or that he acted without the intent necessary for conviction on the second-degree murder and first-degree manslaughter charges. *Cf. Turpin*, 281 F.2d at 639 ("That the jury gave some credence to appellant's theory is suggested to a degree by the return of the lesser included offense of manslaughter in circumstances where he might well have been convicted of [second] degree murder."). Indeed, the statements were both "consistent with," and "essential to and in aid of, his defense." *Id*.; *see also Johnson v. United States*, 275 F.2d 898, 899–900 (D.C. Cir. 1960) (no prejudice where erroneously admitted evidence was "merely statements by which appellant and his co-defendant sought to exculpate themselves and indeed were utilized by appellant to try to make out a theory of 'self-defense.'"). The admission of these exculpatory statements in the prosecution's case-in-chief also enabled petitioner to present his theory of self-defense "without being subjected to cross-examination." *United States v. Bailey*, 743 F.3d 322, 344 & n.17 (2d Cir. 2014)*, cert. denied*, 135 S. Ct. 705 (2014).

Moreover, even without the admission of petitioner's confessions, the prosecution would still have had sufficient circumstantial evidence to establish both that petitioner was responsible for causing McGraw's death, and that he possessed a shotgun with intent to use it unlawfully against another. Wakeela Smalls testified that she and petitioner were standing in front of 101 Terrace Avenue when she saw McGraw and Travis approaching. Trial Tr. 1053. Petitioner ran

34

out of her sight moments before she saw McGraw step into the alleyway between 103 and 105 Terrace Avenue and then grab for the barrel of a gun protruding from the alley and presumably held by somebody else whom she could not see. *Id.* at 1056, 1060. After hearing a shot fired from within the alley, she fled into her apartment building two doors down. *Id.* at 1061–62. A few minutes later, she found petitioner crouching down outside of the front door, holding a shotgun. *Id.* at 1062–63. Petitioner appeared to be "very upset" when he came inside, and immediately wiped the gun down with a cloth. *Id.* at 1064–65, 1091. Elmer Lawson, another prosecution witness, testified that he was in a car stopped outside of the 100 building on Terrace Avenue when petitioner knocked on the door and asked Lawson for a ride to a taxi station. *Id.* at 1261, 1265. Petitioner remained in hiding for the next 11 months. *Id.* at 1289–90. Without petitioner's statements bearing on his state of mind, the prosecution likely would have had *more* success persuading the jury that petitioner intentionally killed McGraw in retaliation for yelling at him earlier that night. *See id.* at 1867–68 (prosecution's closing statement). Indeed, in his summation that followed the defense summation relying on the confession as the basis for the defense of justification, the prosecutor tried to run away from the confession by arguing that he introduced the videotape only to establish the absurdity of petitioner's defense. *Id.* at 1870–72, 1889 ("You all saw the ridiculous story that this defendant told Mr. Holbrook on that videotape.").

In sum, "[w]hile the case where admission of an improperly obtained confession can be considered harmless error is exceedingly rare, this is one." *U.S. ex rel. Moore v. Follette*, 425 F.2d 925, 928 (2d Cir. 1970). In light of the exculpatory nature of the videotaped statement on which petitioner successfully relied to avoid conviction on the most serious homicide offenses that he faced, any error here was harmless.

### 3. Prosecutorial Misconduct

During the trial, it was discovered that Detective Fitzpatrick had discussed her testimony with the prosecutor during a break in her cross-examination, even though the judge had explicitly instructed the detective not to "discuss [her] testimony with anyone, including the Assistant District Attorney." Trial Tr. 1465–66. On cross-examination, Fitzpatrick had stated that she did not remember whether she or petitioner initiated the conversation when he returned from a bathroom break during his interrogation. *Id.* at 1437. On re-direct the following day, Fitzpatrick stated that she had been the one to speak first. *See id.* at 1496. When questioned about the change in her testimony, Fitzpatrick explained that she had remembered the answer overnight and had reached out to the prosecutor to discuss her new recollection. *Id.* at 1497–99.

After sequestering the witness, the trial judge allowed both counselors to be heard before deciding upon a sanction. *Id.* at 1502–07. Defense counsel requested an opportunity to conduct further research before seeking a particular sanction, explaining: "I don't know if I want to ask for a mistrial . . . . I don't know the answer, I have to research it." *Id.* at 1505. The trial judge *sua sponte* struck Fitzpatrick's re-direct testimony in its entirety, explaining that he "d[id]n't want that testimony to lay in wait while [defense counsel is] thinking about what else [he's] going to ask for," *id.* at 1507, and promptly instructed the jury to disregard it, *id.* at 1510. Later that day, defense counsel moved for a mistrial. *Id.* at 1548. He argued that he was not given a fair opportunity to properly confront the witness, because his last few questions on cross-examination had taken place earlier that morning, *after* Detective Fitzpatrick had improperly spoken with the Assistant District Attorney. *Id.* at 1548–49. As a result, defense counsel "d[id]n't know what was and what wasn't changed" in her testimony. *Id.* at 1549. The judge denied the motion without explanation. *Id.* at 1551. Defense counsel then moved to strike the witness's entire testimony, or

alternatively, for an adverse inference charge relating to her credibility as a witness. *See id.* at 1551–53. The judge also denied these motions without elaboration. *Id.*

Petitioner argues that "the conduct in which the prosecutor and detective engaged in [sic] was so improper that the trial court erred in denying the mistrial and then denying the alternate requests for striking the witness' entire testimony or for an adverse inference," and that the error "denied [petitioner] a fair trial and due process." Pet'r's App. Br. 27. The Supreme Court has held, however, that the decision to deny a mistrial is "left to the 'sound discretion' of the judge," *see Renico v. Lett*, 559 U.S. 766, 774 (2010) (citation omitted), and that such a determination must be accorded "the highest degree of respect" by reviewing courts, *see Arizona v. Washington*, 434 U.S. 497, 511 (1978). There is no Supreme Court holding that a trial judge must impose a particular type of sanction whenever a prosecutor has communicated with a witness during a break in cross-examination. Because "[i]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court," *Harrington*, 562 U.S. at 101 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (internal quotation marks omitted), petitioner is not entitled to habeas relief on this ground. More significantly, because the testimony that Detective Fitzpatrick discussed with the prosecutor was only relevant to the admission of petitioner's written confession, which the Appellate Division already ruled to be harmless error, the trial judge's determination of the appropriate sanction could not have possibly denied petitioner a fair trial.

## CONCLUSION

I grant the writ of habeas relief as to the conviction for manslaughter in the second degree and vacate that conviction, and deny it as to the conviction for criminal possession of a weapon in the third degree. Respondent is directed to release petitioner from the custody resulting from the

judgment of conviction of manslaughter in the second degree. The custodial status of petitioner after the judgment here becomes final is to be determined by the New York courts in accordance with the rules applicable to the detention of those awaiting retrial after the conviction has been reversed on appeal. The judgment is stayed pending appeal on the condition that the District Attorney file a notice of appeal and an application for an accelerated briefing and hearing of the appeal within fourteen (14) days from the date the judgment is entered. Moreover, although petitioner has served the maximum sentence of seven years that was imposed on the weapons possession conviction, any potential appeal of the denial of habeas relief on that count is not moot because mootness is judged as of the date of the filing of the habeas corpus petition. I grant a certificate of appealability on that issue.

**SO ORDERED.**

Brooklyn, New York
October 13, 2015

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge